**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DONALD GECKLE, Plaintiff, | ┊ | CIVIL ACTION NO. 3:17-CV-208 (JCH) |
| v. | ┊ | |
| NANCY E. BERRYHILL,[1] ACTING COMMISSIONER OF SOCIAL SECURITY, U.S.A., Defendant. | ┊ | MARCH 26, 2018 |

**RULING RE: CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER (DOC. NOS. 17 & 18)**

## I.    INTRODUCTION

Plaintiff Donald Geckle ("Geckle") brings this action under title 42 section 405(g) of the United States Code, appealing from the final determination of the Commissioner of Social Security (the "Commissioner"), who denied his application for Title II disability insurance benefits in whole, based on a finding that Geckle was not disabled within the meaning of the Social Security Act.  See Motion to Reverse the Decision of the Commissioner ("Pl.'s Mot.") (Doc. No. 17).  The Commissioner cross-moves for an order affirming that decision.  See Motion to Affirm the Decision of the Commissioner (Def.'s Mot.) (Doc. No. 18).

For the reasons set forth below, Geckle's Motion to Reverse the Decision of the Commissioner (Doc. No. 17) is denied, and the Commissioner's Motion to Affirm the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted as the defendant in this case, in place of the former Acting Commissioner of the Social Security Administration, Carolyn W. Colvin.  See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns[ ] or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.").  The Clerk of Court is directed to correct the docket to reflect this substituted party.

Decision of the Commissioner (Doc. No. 18) is granted.

## II.    RELEVANT FACTS[2]

The court adopts the facts to which the parties stipulated, see Def.'s Mot. at 3, and it will therefore only briefly describe the facts relevant to this opinion.

Geckle was 67 years old at the time of his hearing in May 2015.  See Plaintiff's Memorandum in Support of Motion to Reverse ("Pl.'s Mem.") (Doc. No. 17-2) at 3.  He has a bachelor's degree in school psychology and a MBA in computer and information science.  Id.  He has worked in a variety of professional roles, most recently as a fulfillment manager.  Id.  He has also worked as a systems consultant.  Id.

In 2009, Geckle was bit by a tick and contracted Lyme disease.  See Certified Transcript of Record ("R.") (Doc. No. 11) at 33 (hearing testimony of Geckle).  Since that time, Geckle has reported physical and mental fatigue.  Id. at 34.  Between 2009 and 2011, Geckle gradually reduced his hours at work until he was working only fifteen hours per week.  See id. at 233 (letter of Michael P. Meskill, former employer of Geckle).  Then, on March 1, 2011, Geckle's employment was terminated because he was unable to do any physical labor.  See id.

According to the medical evidence in the Record, Geckle has been diagnosed with a wide array of illnesses and disorders, including: Lyme Disease, R. at 490, 494, 605, 612, 635, 665; Chronic Fatigue, id. at 356, 475, 495, 607, 614; Chronic Pain Syndrome, id. at 607, 614; Degenerative Joint Disease, id. at 625; Depressive Disorder,

---

[2] Although the court's Scheduling Order required that the parties make a "good faith attempt to stipulate to the facts" (Doc. No. 13), the parties did not file a stipulation of facts.  The Commissioner adopted the facts as set forth in Cortes's brief and added additional "relevant facts."  Defendant's Memorandum of Law in Support of Motion to Affirm ("Def.'s Mem.") (Doc. No. 18-1) at 3.  The court will rely on the medical chronology in Geckle's brief as if stipulated.

id. at 321, 409, 486, 490, 605, 607, 612, 635, 664; Mood Disorder, id. at 321, 486, 490, 605, 612, 635, 664; and Obstructive Sleep Apnea, id. at 605, 665. See also Pl.'s Mem. at 3–4 (listing all diagnoses with cites to the Record).

## III.  PROCEDURAL HISTORY

Geckle applied for Title II disability insurance benefits on November 7, 2012, alleging a disability onset date of March 1, 2011. See R. at 11. His application was denied initially on March 14, 2013, and, upon reconsideration, was denied again on June 7, 2013. See id. at 47–71. Geckle then filed a written request for a hearing on July 17, 2013. Id. at 83–84. That hearing took place on May 29, 2015, before Administrative Law Judge Ryan Alger ("ALJ Alger"). See id. at 26–46 (transcript of hearing). Geckle was present and testified at the hearing, and was represented by Attorney Ivan Ramos. See id. Vocational expert Michael La Raia[3] ("La Raia") also testified at the hearing. See id.

On June 28, 2015, ALJ Alger issued a Decision denying Geckle's application for disability insurance benefits. See id. at 11–21. In that Decision, ALJ Alger found that Geckle had acquired sufficient quarters of coverage to remain insured through March 31, 2014, meaning that Geckle would need to have been disabled between March 1, 2011, and March 31, 2014, in order to be eligible for disability insurance benefits. See id. at 11. ALJ Alger further found that Geckle suffered from a severe impairment of Lyme disease, as well as non-severe impairments including obesity, hypertension, kidney disease, and cervicalgia. Id. at 13–14. ALJ Alger also found that Geckle

---

[3] La Raia's name is spelled "Larrea" in the hearing transcript, and is spelled "Laraia" in ALJ Alger's Decision. See, e.g., R. at 11, 26. The court takes its spelling from La Raia's resume. See id. at 295–96.

suffered from depression, but that it was a non-severe impairment because it "did not cause more than minimal limitation in [Geckle]'s ability to perform basic mental work activities." Id. at 14. ALJ Alger discussed Geckle's alleged impairment of chronic fatigue, but found that it was a "non-medically determinable impairment" because there was no "medical evidence consisting of signs, symptoms, and laboratory findings" supporting chronic fatigue, and the regulations prohibit finding an impairment "based on symptoms alone." Id. Thus, while ALJ Alger acknowledged that Geckle had been "very adamant about suffering from chronic fatigue syndrome," he concluded that "chronic fatigue syndrome has not been found to be a medically determinable impairment." Id. at 15–16.

ALJ Alger concluded that Geckle had the residual functional capacity ("RFC") to perform "the full range of light work as defined in 20 C.F.R. 404.1567(b)."[4] Id. at 16. In so concluding, ALJ Alger found that Geckle's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Id. at 17. For example, ALJ Alger noted that Geckle's treatment records indicate that he is fatigued "only after exertion and that the fatigue might

---

[4] In pertinent part, Title 20 section 404.1567(b) of the Code of Federal Regulations provides as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

decrease if he used his [continuous position airway pressure ("CPAP") machine] while he slept." Id. ALJ Alger noted that Geckle received unemployment benefits after he was laid off in March 2011, which "required [Geckle] to certify he was willing and able to engage in work activity," and that Geckle had not followed his physician's advice to use a CPAP machine while sleeping. Id. "If the claimant's fatigue were as debilitating as the claimant alleged," ALJ Alger stated, "one would expect him to accept his provider's treatment recommendations and be willing to do what is necessary to improve his condition." Id. at 17–18. ALJ Alger further noted that Geckle was going to the gym to use the bike and weight machines. Id. at 18.

ALJ Alger considered the opinion evidence in the Record, including a treating source opinion submitted by one of Geckle's treating physicians, Dr. Zijad Sabovic, to whom he gave little weight because "her opinion is not supported by the claimant's other medical records, or by the claimant's own assertions." Id. at 19. He also considered letters submitted on Geckle's behalf by a neighbor, Dr. Dan Wilensky; his former employer, Mr. Meskill; and a member of Geckle's church, Ms. Welton. Id. at 20.

Finally, ALJ Alger considered the testimony of vocational expert La Raia, who testified that someone with substantially the same RFC as Geckle could perform two of the positions Geckle had held in the past fifteen years, specifically his most recent position as fulfillment manager and an earlier position as a systems consultant. Id. ALJ Alger found that these positions qualified as "past relevant work that [Geckle] could actually and generally perform in the national economy" based on his RFC determination. Id. at 21. ALJ Alger, therefore, concluded that Geckle was not disabled within the meaning of the Social Security Act during the relevant time period of March 1,

2011, through March 31, 2014.  Id.

Geckle appealed ALJ Alger's Decision, which appeal was denied by the Social Security Appeals Council on December 20, 2016, rendering ALJ Alger's Decision a final decision eligible for district court review.  See id. at 1–3; 42 U.S.C. 405(g).

## IV.    STANDARD OF REVIEW

Under title 42 section 405(g) of the United States Code, it is not the district court's function to determine de novo whether the claimant was disabled.  See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  Instead, the court is limited to two lines of inquiry: whether the ALJ applied the correct legal standard, and whether the record contains "substantial evidence" to support his decision.  See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

## V.    DISCUSSION

In his Motion to Reverse, Geckle makes two arguments as to why ALJ Alger's Decision should be reversed or, in the alternative, vacated and remanded: (1) that ALJ Alger failed to adequately develop the record, Pl.'s Mem. at 13–15; and (2) that ALJ Alger's RFC determination was not supported by substantial evidence, id. at 15–18. The court addresses each argument in turn.

### A.    Failure to Develop the Record

An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately before rejecting the opinion of a treating physician.  See Rosa, 168 F.3d at 79.  Although this obligation is heightened where the plaintiff is pro

6

se, see Echevarria v. Secretary of HHS, 685 F.2d 751, 755 (2d Cir. 1982), the "non-adversarial nature" of social security benefits proceedings dictates that the obligation exists "even when," as in this case, "the claimant is represented by counsel," Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must himself affirmatively develop the record' . . . .") (quoting Echevarria, 685 F.2d at 755).

Geckle asserts that ALJ Alger failed to adequately develop the record in several respects: (1) he failed to request records of sleep studies performed by a "Dr. Brown" at New Britain General Hospital, which sleep studies are referenced in the treatment notes of Dr. Andrew Guest, Pl.'s Mem. at 14; (2) he failed to request records from a "Dr. Khawaja," to whom Dr. Guest refers in another treatment note, id.; (3) he failed to obtain treatment notes from Dr. Jonne Groves, naturopath, from whom Geckle received treatment, id.; and (4) he failed to seek additional treatment records from Dr. Sabovic, id. at 15.

With respect to Dr. Brown and Dr. Khawaja, the Commissioner asserts that neither physician was listed as a treating source in the claimant's application for disability insurance benefits and, therefore, ALJ Alger had no obligation—or authority—to obtain records from either of them.  See Def.'s Mem. at 16; see also R. at 202–07 (disability appeal form dated July 17, 2013, listing only Dr. Sabovic as a treatment provider); id. at 220–25 (disability appeal form dated April 9, 2013, leaving the section for treatment providers blank).  The court agrees with the Commissioner that ALJ Alger was not obligated to obtain treatment records from either Dr. Brown or Dr. Khawaja. The Second Circuit has held that the ALJ's duty to develop the record exists only when

there are "clear gaps" in the record. <u>Rosa</u>, 168 F.3d at 79 ("[A]n ALJ cannot reject a

treating physician's diagnosis without first attempting to fill any clear gaps in the

administrative record."). Although Dr. Brown and Dr. Khawaja are referenced in

treatment notes that are part of the Record in this case, nothing in the treatment notes,

Geckle's applications for disability insurance benefits, Geckle's hearing testimony, or

any other evidence that ALJ Alger had before him suggests that the records of either Dr.

Brown or Dr. Khawaja would be material to a disability determination. <u>See</u> <u>Rosa</u>, 168

F.3d at 79 n.5 ("[W]here there are no obvious gaps in the administrative record, and

where the ALJ already possesses a 'complete medical history,' the ALJ is under no

obligation to seek additional information in advance of rejecting a benefits claim."); <u>cf.</u>

<u>McKane v. Berryhill</u>, No. 3:16-CV-1707 (JCH), 2018 WL 1202763, at *5 (D. Conn. Mar.

8, 2018) (concluding that there was a clear gap in the treatment record where it

contained a treating source opinion from a physician but no treatment notes from that

physician). In light of the evidence before ALJ Alger, the court cannot conclude that the

absence of records from Dr. Brown or Dr. Khawaja constitute a clear gap in the record.

As to Dr. Groves, Geckle has offered no argument as to why——or even whether–

–Dr. Groves's treatment notes would have been helpful for Geckle's disability insurance

benefits claim. Pl.'s Mem. at 14 (merely noting that Geckle "has received treatment

from naturopath Dr. Jonne Graves [sic]" and that "[t]here are no notes in the record from

this provider"). Furthermore, as the Commissioner points out, the hearing office made

two attempts to contact Dr. Groves to obtain treatment records, neither of which was

successful. <u>See</u> Def.'s Mem. at 14–15; <u>see also</u> R. at 50 (record of claim

communications by hearing office reflecting two phone calls to "Groves Naturopathic

Center").  The Commissioner argues that these communications satisfy ALJ Alger's obligation to develop the record, consistent with the social security regulations.  See 20 C.F.R. § 404.1512(b)(1) (stating that the social security administration will make "every reasonable effort" to obtain treatment records, which is defined as making an initial request for evidence and, if no evidence is received in 10 to 20 days, making a follow-up request).  Geckle has not argued, much less provided authority to support, that the efforts of the hearing office were insufficient in this case.  Therefore, the court concludes that the efforts undertaken to obtain records from Dr. Groves, which are consistent with the requirements of the social security regulations, satisfy the duty to develop the record.

With respect to the adequacy of the treatment notes from Dr. Sabovic, Geckle asserts that, despite the fact that Dr. Sabovic has been treating Geckle since 2009, "there are only three notes from Dr. Sabovic during the relevant period."  Pl.'s Mem. at 15.  The Commissioner takes issue with this statement, noting that the Record contains treatment notes from twelve separate visits.  See Def.'s Mem. at 15.  Geckle is correct, however, that most of those twelve visits occurred outside the relevant time period, March 1, 2011, to March 31, 2014.  See id. (noting visit dates).  In fact, both Geckle and the Commissioner miscounted: the Record only contains two treatment notes from Dr. Sabovic related to visits that occurred during the relevant time period.  R. at 361–62 (visit of August 2011), id. at 360 (visit of December 2012).[5]

---

[5] Geckle erroneously described a visit that occurred in September 2014 as within the relevant time period.  See Pl.'s Mem. at 15.

A relative paucity of treatment notes from a treating source may constitute a gap in the record in some circumstances. In Rosa, for example, the Second Circuit was confronted with a case in which the ALJ had rejected the opinion of a treating physician because the treating physician's contemporaneous treatment records did not reflect certain findings. Rosa, 168 F.3d at 79. The Second Circuit found that the record before the ALJ was insufficient to reject the treating source opinion because it contained "clear gaps":

> The ALJ had before her only Dr. Ergas's sparse notes which reflected nine visits between himself and Rosa, considerably fewer visits than the two likely had based upon Rosa's testimony suggesting monthly treatment over a period of years. Moreover, Dr. Ergas's assessment was only one page in length and, as the ALJ recognized, wholly conclusory. Having nevertheless failed to request any additional records or support from Dr. Ergas, the ALJ was left to base her conclusions on incomplete information that was necessarily "conclusive of very little." Confronted with this situation, the ALJ should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information.

Id. at 79–80 (internal citation omitted) (quoting Wagner v. Sec'y of HHS, 906 F.2d 856, 862 (2d Cir. 1990)). The Rosa court concluded that, "by rejecting a treating physician's medical assessment without fully developing the factual record, the ALJ committed legal error." Id. at 80.

The Commissioner argues that remand for further development of the record is not required here for several reasons. First, the Commissioner notes that the hearing office requested records from Dr. Sabovic on two occasions. See Def.'s Mem. at 15; see also R. at 50 (reflecting requests by the hearing office to Dr. Sabovic on December 18, 2012, and January 2, 2013). Second, the Commissioner argues that ALJ Alger had no reason to believe the records received from Dr. Sabovic were incomplete. See

Def.'s Mem. at 16.  Finally, the Commissioner argues that ALJ Alger had only a limited obligation to develop the record because Geckle was represented by counsel.  Id.

The court agrees with the Commissioner that, taking all of these factors into consideration, ALJ Alger did not violate his duty to develop the record with respect to Dr. Sabovic's treatment notes.  In reaching that conclusion, the court recognizes that the circumstances in Rosa were, in some respects, similar to those before the court in this case.  There, as here, the record contained only a few records from the treating physician in question.  See Rosa, 168 F.3d at 79–80.  In addition, there, as here, the ALJ gave little weight to the treating physician's opinion regarding the claimant's functional capacity.  See id.

However, as noted above, an ALJ is not obligated to develop the record further "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history.'"  Id. at 79 n.5.  In Rosa, the sparse records from the treating physician and his "wholly conclusory" opinion were the only pieces of evidence in the record.  Id. at 80.  Here, on the other hand, ALJ Alger had the benefit of hundreds of pages of treatment records from the Veterans Association ("VA") Hospital where Geckle received most of his care during the relevant time period.  See R. at 302–51, 411–26, 485–567, 576–721.  The Record also contains treatment notes from Dr. Andrew Guest dated December 29, 2010, to May 17, 2011.  See id. at 568–73.  ALJ Alger also had the benefit of a consultative examination report by Dr. Sean Hart, Psy.D., and reports from non-examining medical sources, including State agency consulting psychologists Dr. Katrin Carlson, Psy.D., and Dr. Janine Swanson, Psy.D., and State agency consulting physicians Dr. Joseph Connolly, Jr., M.D., and Dr.

Khurshid Khan, M.D.  See id. at 404–10 (report of Dr. Hart); id. at 47–58 (opinions of Dr. Carlson and Dr. Connolly dated March 14, 2013); id. at 60–70 (opinions of Dr. Swanson and Dr. Khan dated June 3, 2013).  In short, the record before ALJ Alger was far more comprehensive than the record in Rosa.  See Tankisi v. Comm'r of Social Sec., 521 Fed. App'x 29, 34 (2d Cir. 2013) (holding that remand was not necessary in light of the "voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ").  As ALJ Alger notes in his Decision, these Records do not support Dr. Sabovic's treating source opinion and, in fact, call into question the validity of Dr. Sabovic's treatment of Geckle.  R. at 19.

This case is further distinguishable from Rosa because, contrary to Geckle's assertion that the sparse notes from Dr. Sabovic constitute "an obvious gap in the administrative record," the court is aware of no reason why ALJ Alger should have believed that the treatment notes from Dr. Sabovic were incomplete.  Unlike Rosa, where the claimant testified that she visited the treating physician on a monthly basis but monthly records were not available, 168 F.3d at 79–80, neither Geckle's testimony nor the medical evidence suggests that there are missing records from Dr. Sabovic. Geckle did not testify, for example, that he visited Dr. Sabovic regularly, and it is undisputed that he was primarily receiving care at the VA Hospital, with which Dr. Sabovic was not associated.  See, e.g., Pl.'s Mem. ("Dr. Guest was Mr. Geckle's primary care physician before Mr. Geckle lost his job and his insurance, and transferred his care to the VA.").  Evidence in the Record indicates that Geckle may have stopped seeing Dr. Sabovic for financial reasons.  See R. at 423 (patient correspondence with VA Hospital in which Geckle states, "My regular Lymes Doctor (non-VA) gave me some

prescriptions which I can't get filled until I see a VA Doctor"); id. at 424 (notes from the VA hospital which states, "[Geckle] can no longer afford prolonged antibiotic treatment with outside Lyme doctor as he has lost his job."); id. at 536 (treatment note from VA Hospital dated January 25, 2012, which states, "Pt recently stopped taking his chronic antibiotics" for Lyme disease and "switched his care to a naturopath").  Furthermore, neither Geckle nor his representative, Attorney Ramos, raised concerns about the records in evidence (or lack thereof) from Dr. Sabovic.  As noted above, Dr. Sabovic's records were provided in response to a request made by the hearing office.  Absent any indication to the contrary, it was reasonable for ALJ Alger to conclude that the records supplied by Dr. Sabovic's office in response to the requests by the hearing office were complete.

Finally, as to the Commissioner's argument that ALJ Alger's duty to develop the record was "lessened where, as here, the claimant [was] represented by counsel," the court agrees that this weighs against finding a failure to develop the record.  Bushey v. Colvin, 607 Fed. App'x 114, 115 (2d Cir. 2015) (summary order).  This is by no means a dispositive consideration because, as noted above, an ALJ has an affirmative duty to develop the record even when a claimant is represented by counsel.  See Pratts, 94 F.3d at 37.  Nevertheless, that Geckle was represented by counsel at his hearing before ALJ Alger provides further support for the court's conclusion that ALJ Alger was not obligated to seek additional records from any of the aforementioned providers.

For the foregoing reasons, the court concludes that ALJ Alger adequately developed the record and, therefore, that his Decision should not be reversed or vacated on this basis.

B.    Treating Source Rule

Geckle does not argue that ALJ Alger violated the treating source rule.  However, the court briefly addresses ALJ Alger's evaluation of Dr. Sabovic's treating source opinion because ALJ Alger's decision to accord Dr. Sabovic's opinion little weight is relevant to his RFC determination, addressed below.  See infra Section V(C).

The treating source rule requires that a treating source's medical opinion be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).  Even if controlling weight is not given, "some weight may still be attached to that opinion, and the ALJ must still designate and explain the weight that is actually given to the opinion."  Schupp v. Barnhart, No. 3:02-CV-103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004); see also 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence . . . .").  "[W]hile the opinions of a treating physician deserve special respect, genuine conflicts in the medical evidence are for the [ALJ] to resolve."  Aponte v. Sec'y of HSS, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted).

Dr. Sabovic, who has treated Geckle since 2009 for Lyme disease, submitted a treating source opinion dated May 1, 2013.  See R. at 297–301.  Among other things, Dr. Sabovic opined that Geckle could sit for up to an hour, stand for fifteen minutes, would require twenty minute breaks every thirty minutes, could frequently lift up to ten pounds but never lift twenty pounds, and can frequently twist and stoop, occasionally

14

climb stairs, and never crouch, squat, or climb ladders.  Id. at 299–300.  He further

opined that Geckle would be off task more than 25 percent of the day and was

incapable of even "low stress" work as a result of his increased fatigue and diminished

concentration.  Id. at 301.

As aforementioned, Geckle does not take issue with ALJ Alger's application of

the treating source rule to Dr. Sabovic's treating source opinion based on the evidence

in the Record.  Geckle does argue, however, that if ALJ Alger had adequately

developed the record, he would have reached a different conclusion with respect to the

treating source opinion submitted by Dr. Sabovic:

> Mr. Geckle's treating physician, Dr. Sabovic[,] offered detailed
> opinion evidence, which the ALJ rejected.  The only reason
> Dr. Sabovic's opinion is "not supported by [Mr. Geckle's] other
> medical records" is because the ALJ left a large portion of Mr.
> Geckle's treatment records missing.

Pl.'s Mem. at 15.  As this quotation illustrates, Geckle implicitly agrees with ALJ Alger

that, based on the evidence in the Record, Dr. Sabovic's opinion was not supported.

See id.

The court concludes that there is substantial evidence in the Record to support

the ALJ's decision that Dr. Sabovic's opinion was not supported by the medical

evidence in the Record.  For example, on May 16, 2013, Dr. Shutish Patel, neurologist,

found that a neurological review of systems was "unremarkable."  R. at 321.  He noted

that Geckle complained of fatigue, but that he was fatigued "only after exertion and a

review of his functional capabilities shows that he can walk and run ('up to 200 yards')

before tiring."  Id.  Dr. Patel further noted that, although Geckle "reported feeling

'clumsy' he could walk in tandem when tested."  Id.  Finally, Dr. Patel mentioned that

Geckle "did not offer any [symptoms] to suggest memory problems."  Id.

Furthermore, ALJ Alger found not only that the medical evidence of record was inconsistent with Dr. Sabovic's opinion but also the claimant's own reports of his physical strength were.  See id. at 19; see also id. at 217 (claimant's statement that he can lift up to 20 pounds); id. at 245 (claimant's statement that he can lift up to 30 pounds).  ALJ Alger further noted that Dr. Sabovic's diagnosis and treatment of Geckle were called into question by Geckle's treatment providers at the VA Hospital.  See id. "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," an ALJ may afford less than controlling weight to a treating physician's opinion where "the treating physician issued opinions that are not consistent with other substantial evidence in the record."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  Here, the court agrees with Geckle's implicit acknowledgment that, based on the record before him, ALJ Alger's decision with respect to Dr. Sabovic's opinion was supported by substantial evidence.  Furthermore, having determined that ALJ Alger did not fail in his duty to develop the record, the court finds no error in ALJ Alger's treating source decision.

C.    RFC Determination

In his Motion to Reverse, Geckle argues that ALJ Alger erred in failing to include specific functional limitations in his finding with respect to Geckle's residual functional capacity ("RFC").  The social security regulations defines RFC as "the most [the claimant] can do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  RFC determinations are based on a claimant's "capacity for work activity on a regular and continuing basis."  See id. at § 404.1545(b).

As noted above, ALJ Alger found that Geckle could perform the "full range of light work."  R. at 16.  Geckle argues that this RFC determination was not supported by

substantial evidence because it did not include limitations based on the following alleged impairments: (1) fatigue and joint pain; (2) mental impairments including memory, concentration, and focus; and (3) difficulty with repetitive arm use.  Pl.'s Mem. at 16–17.

As a threshold matter, the court notes that much of Geckle's argument regarding ALJ Alger's RFC determination rests on the premise that ALJ Alger should have developed the record further and should have, subsequently, given great if not controlling weight to Dr. Sabovic's opinion.  See Pl.'s Mem. ("The ALJ assigned Dr. Zijad Sabovic little weight based on a lacking record, however, if the ALJ had assigned Dr. Sabovic significant or . . . or even great weight . . . he should have limited Mr. Geckle to[,] at most, sedentary exertion work.").  Because the court has already concluded that ALJ Alger did not fail to adequately develop the record, and that his decision to give Dr. Sabovic's opinion little weight was supported by substantial evidence, see supra Section V(B), the court further concludes that it was reasonable for ALJ Alger to make RFC findings that differ from Dr. Sabovic's.

Geckle also cites his own hearing testimony, as well as complaints reflected in his treatments notes, as support for his argument that ALJ Alger erred in his RFC determination.  See, e.g., Pl.'s Mem. at 16 ("Mr. Geckle has repeatedly complained to his providers about his severe and ongoing fatigue."); id. at 17 ("Mr. Geckle reported to consultative examiner Dr. Sean T. Hart that he frequently finds himself forgetting what he wants to say because of losing his train of thought."); id. (describing Geckle's reports of chronic neck pain and left shoulder pain).  Although ALJ Alger was obligated to take Geckle's subjective reports of his pain and fatigue into consideration, he was "not

required to accept [Geckle's] subjective complaints without question," but rather "may exercise discretion in weighing the credibility of [Geckle's] testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

In his Decision, ALJ Alger described Geckle's hearing testimony and provided detailed explanations for his conclusion that Geckle's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." R. at 17. With respect to Geckle's testimony about his fatigue, ALJ Alger cited treatment notes from the VA Hospital that state: "the fatigue is only after exertion and that the fatigue might decrease if he used his CPAP while he slept." Id. at 17 (citing id. at 641). ALJ Alger also stated that Geckle's credibility with respect to the severity of his fatigue was undermined by the fact that Geckle "has not followed his physician's advice to use a CPAP."[6] Id. at 18; see Heagney-O'Hara v. Comm'r of Social Sec., 646 Fed. App'x 123, 126 (2d Cir. 2016) (summary order) ("An ALJ is required to consider a variety of factors when assessing a claimant's credibility, including whether the claimant has received treatment, other than medication, to relieve her symptoms."). The court concludes that ALJ Alger's decision not to credit Geckle's testimony regarding his fatigue was supported by substantial evidence in the Record.

As to Geckle's complaints of joint pain, ALJ Alger acknowledged those

_____

[6] As Geckle accurately points out, ALJ Alger's statement regarding his willingness to pursue treatment is partially erroneous because, although Geckle did initially decline to participate in a sleep study, he ultimately participated in two. See Pl.'s Mem. at 14; R. at 570. However, the court agrees with the Commissioner that this oversight on ALJ Alger's part is of minor significance, since the sleep studies led to a recommendation that Geckle use a CPAP machine, which he refused to do, and it is the refusal of treatment that supports ALJ Alger's conclusion. See R. at 570 (noting in connection with the second sleep study that Geckle was given a CPAP); id. at 667 ("Patient was asked to use his cpap machine but will not use it at this time."); Def.'s Mem. at 9 ("The fact that [Geckle] underwent a sleep study, but did not follow the treatment recommendations that arose from the results of that sleep study, is consistent with the ALJ's determination that if Plaintiff's fatigue was as debilitating as alleged, he would have been willing to undergo the recommended treatment to improve the condition.").

complaints, but found them incredible because "the objective medical evidence shows normal physical examinations." Id. at 17. This explanation, which is supported by the medical evidence; see id. at 323, 330; constitutes substantial evidence in support of ALJ Alger's decision not to credit Geckle's complaints of joint pain. See also id. at 664 (treatment notes dated September 30, 2013, reflecting that Geckle "denies . . . joint aches except for some mild pain occasionally in his left knee"). Furthermore, Geckle's argument to the contrary is based on Dr. Sabovic's treating source opinion, see Pl.'s Mem. at 16–17, which ALJ Alger decided to accord little weight, see R. at 19, and which decision this court has already found was not made in error, see supra Section V(B). The court therefore concludes that ALJ Alger's decision not to incorporate functional limitations related to Geckle's joint pain was supported by substantial evidence.

Geckle also argues that ALJ Alger "should have included limitations as to Mr. Geckle's memory, concentration, and ability to maintain focus." Pl.'s Mem. at 17. Although Geckle reported limitations in these areas to consulting examiner Dr. Hart, Dr. Hart himself concluded that Geckle "has the capacity to attend and concentrate and focus on what he is reading" based on his activities of daily living, and his diagnostic evaluations reflected that "overall [Geckle's] short-term memory appeared intact, his attention/immediate memory was excellent" and "he likely falls in the superior range of intelligence." R. at 409. Furthermore, objective testing has not revealed abnormalities in Geckle's cognitive functioning. For example, Geckle underwent an MRI in August 2010 after reporting problems with memory and concentration, but the MRI results were normal. See id. at 467, 475. Therefore, substantial evidence supports ALJ Alger's decision not to find Geckle limited in the areas of memory, concentration, and focus.

Finally, Geckle argues that ALJ Alger "should have included limitations as to Mr. Geckle's repetitive arm use." Pl.'s Mem. at 17. In support of this argument, Geckle cites at length to VA Hospital treatment notes dated April 2, 2014. See R. at 625. Those notes reflect that Geckle's complaint of cervicalgia "[s]tarted 3 weeks ago when he was trying to push the car trying to help someone."[7] Id. The notes mention that Geckle has a history of cervicalgia dating back to 2012, but also that he "declined tender point injection at that time" and that he went to occupational therapy in 2012 and found it helpful. Id. Although the Record reflects that Geckle reported and was treated for pain in his neck, shoulder, and back at various times, the Record indicates that his pain was intermittent and treatable. See, e.g., id. at 625; id. at 664 (treatment notes dated September 30, 2013, stating that Geckle's chronic neck and back pain "is tolerable and [Geckle] takes one ibuprofen a day for pain relief"). The court notes that, at the hearing before ALJ Alger, Geckle did not raise the subject of neck, shoulder, or back pain at all, much less assert that he was precluded from working because of that pain. See id. at 33–36 (testimony of Don Geckle). Finally, as noted in relation to Dr. Sabovic's treating source opinion, see supra Section V(B), Geckle submitted forms to the hearing office reflecting that he could lift 20 to 30 pounds, id. at 217 (claimant's statement that he can lift up to 20 pounds); id. at 245 (claimant's statement that he can lift up to 30 pounds). Based on the Record as a whole, it was reasonable for ALJ Alger to conclude that Geckle's neck, shoulder, and back pain did not greatly limit his activities. See Gallagher v. Colvin, 243 F. Supp. 3d 299, 306 (E.D.N.Y. 2017)

---

[7] As noted above, see supra Section III, the relevant time period for Geckle's disability insurance benefits application is March 1, 2011, to March 31, 2014. Therefore, it appears that Geckle had only been experiencing pain from cervicalgia for approximately three weeks of the relevant time period.

(concluding that ALJ's RFC was supported by substantial evidence despite not accounting for claimant's subjective complaints because the claimant's "condition can be managed by medications" and therefore "did not greatly limit his activities").

As this analysis reflects, ALJ Alger's Decision contains a detailed description of his reasons for the RFC determination that he reached that are supported by the evidence in the Record. To the extent that the RFC determination does not reflect all of the limitations that Geckle alleges, ALJ Alger thoughtfully weighed the evidence and reached conclusions that were supported by substantial evidence. The court, therefore, declines to reverse or remand on this basis.

## VI.     CONCLUSION

For the foregoing reasons, the court concludes that the ALJ adequately developed the Record and the ALJ's Decision was supported by substantial evidence. Therefore, Geckle's Motion to Reverse or Remand the Decision of the Commissioner (Doc. No. 17) is **DENIED** and the Commissioner's Motion to Affirm the Decision of the Decision of the Commissioner (Doc. No. 18) is **GRANTED**. This matter is hereby dismissed and the Clerk of Court is instructed to close this case.

**SO ORDERED**.

Dated this 26th day of March 2018 at New Haven, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge